[Civ. No. 20313.   Second Dist., Div. One.   Dec. 6, 1954.]

PEARL SHERMAN, Plaintiff and Appellant, v. VIVIAN PANNO et al., Defendants and Appellants.

Hill & Attias, Henry Attias and Philip Glusker for Plaintiff and Appellant.

Bernard C. Brennan and Edward W. Moses for Defendants and Appellants.

WHITE, P. J.—This is an appeal by plaintiff, Pearl Sherman, from an order granting defendants' motion for a new trial upon the ground of the insufficiency of the evidence. The defendants, Vivian Panno and Carlo Panno, husband and wife, have cross-appealed from the whole and each and every part of the judgment.

The action is one by Pearl Sherman and her husband, Marty Sherman, to have the court declare and enforce a resulting trust over a parcel of farm land in the Imperial Valley of California. At the conclusion of the trial, the judge announced that judgment would be for the plaintiff, Pearl Sherman. Findings and judgment were prepared and served on defendants on August 21, 1953. No objections having been filed, the judge signed the findings and judgment on August 27, 1953, and the judgment was duly entered on August 28, 1953.

On August 28, 1953, plaintiffs mailed notice of entry of judgment to defendants' attorney, who had acted throughout the litigation. On the same day, defendants' present counsel mailed to plaintiffs' attorneys a copy of a substitution of attorneys and filed the substitution and proof of mailing. August 31, 1953, said notice of entry of judgment and proof of mailing were filed.

On September 1, 1953, another notice of entry of judgment was mailed by plaintiffs to defendants' present counsel; and said notice and proof of mailing were filed September 2, 1953. A second substitution of attorneys for defendant, Vivian Panno, was mailed by defendants' present counsel to plaintiffs' counsel on September 10, 1953, and filed September 11, 1953.

September 8, 1953, defendants filed notice of intention to move for a new trial. The motion was heard and submitted on October 27, 1953, by a judge other than the one who had tried the case. By minute order dated October 28, 1953, defendants' motion for a new trial was granted on the ground of insufficiency of the evidence.

It is now contended on this appeal that the motion for new trial was automatically denied by lapse of time on October 27, 1953; that the order granting the new trial herein was made on the 61st day after service upon defendants of notice of entry of judgment and is void.

". . . the power of the court to pass on motion for a new trial shall expire sixty (60) days from and after service on the moving party of written notice of the entry of judgment, . . . . If such motion is not determined within said period . . . the effect shall be a denial of the motion without further order of the court." (Code Civ. Proc., § 660.)

"It is thus left to the prevailing party to take the initiative in insuring the finality of the judgment by serving upon the opposing party written notice of entry of the judgment. When

he does so, the time within which a motion for new trial may be made (*Labarthe* v. *McRae,* 35 Cal.App.2d 734 [97 P. 2d 251]) and granted (*Gross* v. *Hazeltine,* 206 Cal. 130 [273 P. 550]) begins to run.'' (*McCordic* v. *Crawford,* 23 Cal.2d 1, 5 [142 P.2d 7].)

The portion of section 1013 of the Code of Civil Procedure allowing an additional day after service by mail is inapplicable to the facts now before the court, for the trial court which granted the motion for new trial is not an ''adverse party.'' (*Kahn* v. *Smith,* 23 Cal.2d 12, 15 [142 P.2d 13].)

■ Since the Legislature has fixed the period within which a new trial may be granted at 60 days, it is not for this court to override the limitation. (*McCordic* v. *Crawford,* 23 Cal.2d 1, 5-6 [142 P.2d 7]; *Millsap* v. *Hooper,* 34 Cal. 2d 192, 193 [208 P.2d 982].) Therefore, it is apparent that, if the mailing of written notice of entry of judgment on August 28, 1953, to defendants' former attorney was ''service on the moving party,'' the defendants' motion for new trial was denied by lapse of time on October 27, 1953. (Code Civ. Proc., § 660.) ''Notices must be in writing, . . . served upon the party or attorney in the manner prescribed. . . .'' (Code Civ. Proc., § 1010.) The service was complete ''at the time of the deposit.'' (Code Civ. Proc., § 1013.)

Defendants make no claim that the content and form of the notice of entry was not in all respects proper, or that defendants were not cognizant of the first notice from the time of its service. Nevertheless, defendants contend that the notice of entry of judgment should have been served upon their substituted counsel instead of their former counsel, and that such notice was therefore ineffective to start the running of the period within which a new trial could be granted.

''When an attorney is changed . . . written notice of the change and of the substitution of a new attorney . . . must be given to the adverse party. *Until then he must recognize the former attorney.*'' (Emphasis added.) (Code Civ. Proc., § 285.)

In the case of *Grant* v. *White* (1856), 6 Cal. 55, defendant moved for a new trial and employed other attorneys. Plaintiff's attorney was not given the required written notice of substitution, and notice of the time for argument on motion for new trial was served upon defendant's attorney of record, who then told plaintiff's attorney he had no further connection with the matter; plaintiff's attorney insisted upon serving him as attorney of record; and the attorney of record

forgot to inform defendant's substituted attorneys. Defendant was not represented in court and the motion for new trial was denied. On appeal from the order denying a new trial, defendant sought reversal because notice had not been served upon her substituted counsel. The court said, at pages 55 and 56: "To avail the defendant of this objection, there should have been a regular substitution of counsel in the mode pointed out by the statute."

In *Morton* v. *Kohler,* 70 Cal.App. 458 [233 P. 415], defendant appealed from a judgment for plaintiff on the ground that no notice of the time of trial was served on him five days prior to the trial. The judgment was affirmed and the court, at page 464, said: ". . . the attorneys for the plaintiff were bound by law to recognize Messrs. Roche and Ibos *until they received written notice of a substitution of attorneys."* (Emphasis added.)

To the same effect is the decision in *Reynolds* v. *Reynolds,* 21 Cal.2d 580, 584 [134 P.2d 251], where it is said: "A client may of course discharge his attorney at any time (citing authority), but during the course of a proceeding service of papers on the attorney of record, where service upon the attorney is proper, binds the client *until the attorney is discharged or substituted out of the case in the manner provided by law."* (Emphasis added.)

In the instant action, defendants' substituted attorneys, on the day of service of the notice of entry of judgment upon defendants' former attorney, filed and mailed notice of substitution. That notice had not been received, and in the regular course of the mail it could not have been received, by plaintiffs' counsel prior to the mailing of the notice of entry of judgment. However, in the appeal now engaging our attention, defendants contend that, because such notice of substitution had been filed and mailed, the notice of entry of judgment was invalid and of no effect. With this contention, we cannot agree. If such were the rule, before an attorney could give notice of entry of judgment, or any other notice, with any assurance of its effect, it would be necessary to check, not only the docket, but also all papers filed in the clerk's office up to the moment of service. ▮ We believe the clear intention of the Legislature, as expressed in section 285 of the Code of Civil Procedure, is that the plaintiffs' attorneys were bound by law to recognize defendants' former attorney of record *until they received written notice of a substitution of attorneys.*

■ Where, as here, the written substitution was signed by the defendants' and the former and substituted attorneys on August 27th, filed on the 28th, and notice thereof mailed to plaintiffs' attorney so that, in the ordinary course of the mail, it would be received by plaintiffs' attorneys on the 29th, the substitution had not been completed in the manner required by the statute before the notice of entry of judgment was served on August 28th upon defendants' former counsel; and the 60-day period within which a new trial could be granted began August 28th and ended October 27th, 1953. The order granting a new trial was therefore in excess of the jurisdiction of the trial court and must be reversed.

We are not impressed by defendants' argument that, even if the notice of entry of judgment was given in accordance with the statute on August 28, 1953, plaintiffs, by serving upon defendants' substituted counsel another notice of entry of judgment on September 1, 1953, thereby waived, and were estopped from relying upon, any effect which the August 28th notice might have had. When the notice was given as required by statute on August 28, 1953, the period began, and the service of another notice did not extend that period.

Our decision that the order granting a new trial must be reversed for the reason that it was made after the expiration of the statutory time and was in excess of the jurisdiction of the trial court, makes it unnecessary to consider plaintiffs' contention that the order was an abuse of discretion. Therefore, we proceed to the consideration of the cross-appeal of defendants which was taken from the whole of the judgment and each and every part thereof. That judgment provides, among other things, that the deed of two certain parcels of real property "dated April 18, 1951, from Pearl Sherman, by Marty Sherman, her attorney in fact, to Carlo Panno and Vivian Panno, husband and wife, in form a deed absolute, be, and the same hereby is, declared to be, a mortgage, and the defendants Vivian Panno and Carlo Panno hold legal title to the real property hereinabove described as trustees for the benefit of Pearl Sherman."

Defendants urge that the evidence is insufficient to support the judgment, in that plaintiffs failed to prove: (1) that a friendly relationship existed between plaintiffs and defendants; (2) that the actual cash value of the land was in excess of the cash and credit paid and loaned by defendants for it; (3) that plaintiffs continued to act as owners would have acted; and (4) that the conduct of defendants was that of lenders and not of owners.

As in most actions wherein deeds absolute in form have been determined to be in fact mortgages, the evidence is conflicting. If there is any substantial evidence in the record which supports the judgment, the judgment should not be reversed because of insufficient evidence. "All questions as to preponderance and conflict of evidence are for the trial court." (*Beeler* v. *American Trust Co.*, 24 Cal.2d 1, 7 [147 P.2d 583]; *Viner* v. *Untrecht*, 26 Cal.2d 261, 271 [158 P.2d 3].)

A review of the pertinent evidence found in the record follows. In 1945 the plaintiffs became lessees with an option to purchase the Westmoreland Ranch, hereafter referred to as "the ranch." In 1946, they exercised the option and purchased the ranch for $54,000; and they organized National Growers and Shippers, Inc., a California corporation, hereafter referred to as "the corporation," to which they conveyed many of their assets, including the ranch. Plaintiff Marty Sherman bought and sold produce, and managed a partnership as well as the corporation. In 1947, because of losses not in any way connected with the ranch, and at a time when 100 per cent of the corporation's stock was owned by the Shermans, the corporation assigned all of its assets to W. W. Gray, as assignee for the benefit of creditors, and, pursuant to such assignment, deeded the ranch to him. Farming operations on the ranch were at all times profitable, the 1946 profit being approximately $23,000. The assignee and the creditors' committee agreed orally with Sherman that they would sell the other properties before resorting to the ranch; that they would continue to operate the ranch and apply the profits in payment of the corporation's debts; that if the debts were not fully discharged in a reasonable time without selling the ranch, they would give plaintiff Marty Sherman the chance to meet any offer before selling the ranch.

Late in 1950, all the other assets of the corporation had been disposed of by the assignee and there remained some unpaid debts of the corporation. The ranch was then listed with several Imperial Valley real estate brokers, who were informed that any offer would be subject to Sherman's right to repurchase the ranch at the price offered.

In January of 1951, the assignee received an offer of $46,000 cash for the ranch, subject to payment of a $2,300 real estate commission. He then informed plaintiff Marty

Sherman that pursuant to their agreement plaintiff could have the ranch for the net cash price of $43,700, and plaintiff accepted the offer. The deal was put in escrow with Security Title Company on January 18, 1951, title to go to plaintiff Pearl Sherman as her separate property. On January 19, 1951 the Bank of America, using admittedly conservative values, appraised the ranch at $54,000 and agreed to lend plaintiff Pearl Sherman $25,000 on a first trust deed. At that time plaintiffs expected to provide the remaining $19,000 from the sale of their lettuce crop, which "looked like it was going to make a lot of money," but turned out "a fizzle." Plaintiff Marty Sherman then tried to borrow from several sources, including defendant Carlo Panno. According to the testimony of plaintiff Marty Sherman, defendant Carlo Panno agreed to help plaintiffs finance the purchase. They had several conversations about it in Los Angeles and several in El Centro. As to one such conversation, which took place in Los Angeles in April 1951, plaintiff Marty Sherman testified as follows:

"Again, we always met in the market there and we would go and have coffee or a sandwich, and on our way to the restaurant we were discussing the ranch, and I told him, 'Carlo,' I said, 'Carlo, it is getting pretty late and the escrow is due to close in another week or so.' 'Well,' he said, 'don't worry about that, I told you I am going to loan you the money, I am going to do it, I will see you there on the 17th and everything is going to be all right.' About that time Mr. Gray walked by and said, 'Hello, Marty.'

"Q. You mean Mr. W. W. Gray?

"A. Mr. W. W. Gray walked by and he said, 'Hello, Marty'; I said, 'Hello.' He said, 'I see you have your angel with you. Will you let me know how you are getting along, because we have had several offers on that property and it isn't too far off for escrow time.' Mr. Carlo Panno broke in at that time and said, 'Don't you worry about that, I am going to take care of everything as I agreed.'"

As to one of their conversations, plaintiff Marty Sherman testified: "Q. Was anything said about the length of the pay-off of his loan? A. Yes, I told him he should have his money between two and three years, not to exceed three years. He says, 'Well, supposing I don't get my money back in three years?' I said, 'If you don't get your money back in three years, I think I will be in a position over that period of time to come up with any shortage of the amount due you.'

He said, 'All right, that is fine.' He says, 'I will loan you the money, and when you pay me back I will give you back the ranch.' "

In his testimony as to Mr. Panno's statements, plaintiff Marty Sherman testified: "He said that if the— in view of my situation and some of the bank notes that I still had to take care of and the business the way it was going, why, I would be much better off with the ranch in his name, he could handle the payments and pay the taxes and whatever upkeep there might be and at the same time pay himself out, and when he did so, why, he would give us back title to the ranch.

"Q. What, if anything, did you say, Mr. Sherman?

"A. I told him again, I says, 'It is all right with me. I would trust you. You can go ahead on that basis, if you feel it is better for us, go ahead.' "

Plaintiff Marty Sherman and defendant Carlo Panno met in El Centro and went together to see the escrow holder. They had the title company change the escrow instructions to show the defendants as grantees. They then went together to the Bank of America and had plaintiff Pearl Sherman's application for a loan changed to show the defendants Carlo Panno and Vivian Panno as the borrowers. Both the escrow and the loan changes were made by interlining the papers in the existing files. A deed from W. W. Gray, the assignee, to plaintiff Pearl Sherman had already been deposited in the escrow; and one from Pearl Sherman, by Marty Sherman, her attorney in fact, to defendants (the deed adjudged by the trial court to be a mortgage) was then deposited.

Plaintiff Marty Sherman and defendant Carlo Panno had known each other for about 20 years, and each had done occasional business favors for the other. They often met for coffee in Los Angeles and in Imperial Valley. Panno had cosigned with Sherman for several bank loans. In connection with one of them, Sherman had left securities with Panno, upon the oral understanding that Panno would keep them and use them only in the event Panno should have to pay the note; and later, by their further oral agreement, Panno had sold the securities, paid off the note, and turned over to Sherman the balance of the money realized on the securities. Sherman trusted Panno.

Through the years, the Pannos and Shermans had occasionally entertained each other in their respective homes, and had celebrated a few anniversaries together at other

places. The defendants denied any friendship between them, and described their relationship as a mere business acquaintance. When defendant Carlo Panno was asked if Mrs. Sherman had not given Mrs. Panno her own hand-knitted dress, defendant Carlo Panno admitted that Mrs. Panno had received such a dress but he said it was security for a small loan. Plaintiff Pearl Sherman's testimony as to the dress follows:

"Q. BY MR. HILL: You have heard some talk here, Mrs. Sherman, about knit dress or knit dresses. Do you know any facts about a knit dress in connection with the Pannos?

"A. Yes. Q. Tell us about it. A. There was one knit dress involved, and that dress I had made for myself. Q. You knit it yourself? A. Yes, I did. Q. Yes? A. And I must say it takes months of hard labor to make them. They came to our home one evening when we were going out to dinner and so forth, and while the men were having a drink and talking business, I said, 'Oh, Vivian, I must show you this dress I just finished,' and I had just got it back from the blockers that day, and I showed it to her and she fell in love with it. She asked me if she could try it on. I said, 'Why certainly.' She went in and tried the dress on. I think she walked out. She showed it to Carlo. He fell in love with it. They pleaded with me to sell it to them. I told them I wouldn't sell it for any price. So since the Pannos have been very nice to us on numerous occasions I felt I wanted to give it to her as a gift. Q. Did you give it to her? A. Yes, I did."

During the time between Sherman's agreement to repurchase the ranch from the assignee and Panno's signing of the escrow instructions and deposit of his money, the ranch was listed for sale by Sherman with various real estate brokers for $100,000; and offers up to $65,000 cash were refused by him. The value of the ranch was estimated by the various brokers at from $65,000 to $100,000.

After the escrow was closed, in accordance with their oral understanding as testified to by Sherman (and denied by Panno), Panno was to collect all income from the ranch, and apply it upon maintenance of the ranch, payment of principal and interest instalments to become due the Bank of America upon its loan, and to use the balance to repay his own loan. From time to time they discussed the management of the ranch. Together, they decided to cancel a crop lease and make a new lease for a flat cash rental. Plaintiff Marty Sherman helped defendant Carlo Panno to collect the owner's

share under the crop lease and the payments due under the oil lease.

Some months after the Pannos had taken title to the place, Panno did not know the way to the ranch; asked the tenant, who farmed the ranch in 1950 and 1951, to show him; and for the first time asked about boundaries and acreage. The following is quoted from the testimony of the tenant farmer, Swerdfeger:

"Well, on the way out there in his car, why, I was curious, and so I asked him how come him to buy a piece of land he didn't know what it was. And he says, 'Well,' he says, he says, 'I know Marty Sherman a long time and I loan him money many times, but', he says, 'This time I beat him.' He said, 'Why should I settle for a couple thousand dollars when I can get so much more?' So then I said, 'Well, how did you do that?' 'Well', he said, 'I was supposed to loan Marty the money but when it come time to get it out of escrow'——— or put it in escrow, I forgot how——— 'I told him, "No, Pearl Sherman name on there, Carlo Panno, that is all," so I make him take Pearl Sherman name off and put it in Carlo Panno name only,' so he says, 'Now it is my ranch, and Marty Sherman don't get it back.' " . . . "Q. Did he mention receiving any offer for sale of the ranch? A. Oh, yes, he said that on the way out there. That is when he said he was going to beat Sherman because, 'Right after I got out of the escrow', he said, 'I was offered $70,000 for it,' and he says, 'Now I can sell it for $90,000.' That was in the car on the way out to the ranch." There is not one reference to the above conversation in the ten pages of cross-examination; and when defendants' attorney repeated his questions as to another matter Mr. Panno volunteered, "He is honest," referring to the witness Swerdfeger.

While plaintiffs state that "Panno never sought to deny any part of this conversation after Swerdfeger's testimony concerning it had been given," we find that defendant Carlo Panno was examined by plaintiffs' counsel under section 2055 of the Code of Civil Procedure before the above quoted testimony of Swerdfeger had been given, and the following is quoted from the record:

"Q. Do you remember telling Mr. Swerdfeger you had an offer to sell this ranch, could have sold it for $70,000 the day you bought it? A. No. Q. Or that you later found out you could sell it for $90,000? A. No. Q. Do you remember

telling him about your arrangements to make Marty Sherman a loan on this ranch? A. No. Q. Nothing like that was said? A. Nothing like that.''

While the trial judge might have believed defendant Panno, it is apparent from the findings and judgment that he did not believe Carlo Panno's testimony as to his conversation with Swerdfeger, or his version of his agreement with plaintiff Marty Sherman. ■■■ The credibility of witnesses is a question primarily for the trial court, and on appeal we are not authorized to disturb the conclusion arrived at by the duly constituted arbiter of the facts unless we can say as a matter of law that testimony believed by the trial court is inherently improbable. The testimony relied upon by the trial judge in the instant case cannot be so strictured.

According to plaintiff Marty Sherman's testimony, when he believed there had been enough income from the ranch to pay off his entire indebtedness to defendant Carlo Panno, he asked for a statement and reconveyance, and for the first time learned that Panno claimed the ranch as his own and refused to perform his promise to return the ranch to plaintiffs when the debt was paid.

From an accounting furnished by defendants at the close of the trial, August 13, 1953, defendants had received income from the ranch from April 30, 1951, to August 13, 1953, amounting to $35,688. They had paid to the Bank of America, including principal and interest, the sum of $7,322.95, and operating expenses of $3,024.61. Plaintiffs' debt to defendants, principal and interest at 7 per cent, amounted to $20,935.17; and defendants were entitled to $100 a month or $2,800 as compensation for their efforts in managing the property during the time that they had held legal title. After deducting from the total income, the total amount of their credits, defendants then owed plaintiff Pearl Sherman $1,605.27.

After adjudging the deed to be a mortgage, as hereinbefore set forth, the trial court decreed that defendants ''are indebted to the plaintiff Pearl Sherman in the sum of $1,605.27,'' and further ordered ''that upon the delivery to the defendants Vivian Panno and Carlo Panno of a satisfaction of their note to the Bank of America dated April 17, 1951, in the original sum of $25,000.00 and the deed of trust on the above described property given to secure said note, the defendants shall forthwith surrender unto the said Pearl Sherman the possession of said premises, and the said Vivian

Panno and Carlo·Panno shall make, execute and deliver unto said Plaintiff Pearl Sherman, as her sole and separate property, a good and sufficient warranty deed to the said property . . ." and "assign . . . all leases and any other contract, agreements or rights . . . and have all income . . . becoming due and payable on and after August 13, 1953, paid to the plaintiff Pearl Sherman. . . ."

Plaintiffs claim that they received no consideration whatever from defendants for their deed. This contention is not in accord with the fact that $43,700 was paid through the escrow to the assignee for plaintiffs' corporation's creditors and used to discharge the debts of the corporation. There is no difference in principle between the instant case and one where the cash loaned is paid directly to the mortgagors.

Defendants emphatically urge that plaintiffs can have no beneficial interest in the ranch because they furnished none of the stated purchase price of $43,700. In view of the facts that no witness estimated the value of the property at less than $54,000, during the period from 1945 to 1953, that real estate brokers estimated its 1951 value at from $65,000 to $100,000, that plaintiff Marty Sherman turned down a cash offer of $65,000 just before completing his deal with defendants, and that it was solely because of Sherman's agreement with the committee of the corporation's creditors that he was given the opportunity to acquire the property for the price of $43,700, it is manifest that his purchase agreement was equal to a deposit in escrow to apply upon the purchase price of cash amounting to at least $10,000 and probably exceeding defendants' money used in connection with the purchase.

Plaintiffs' payment of a portion of the purchase price, however, was not essential to the holding that the deed absolute on its face was in fact a mortgage. The following language is quoted from *Viner* v. *Untrecht,* 26 Cal.2d 261, 269-270 [158 P.2d 3]:

"In the ordinary case a resulting trust arises in favor of the payor of the purchase price of the property where the purchase price is paid by one person and the title is taken in the name of another (Civ. Code, § 853; 25 Cal.Jur. 178). It is not always necessary that the payment of the purchase price be made by the claimant of the beneficial interest. It may be made by the transferee when it constitutes a loan from the transferee to the claimant. (Citing

cases). Nor is a resulting trust prevented by an assumption by the transferee of an obligation to the vendor or transferor to pay the purchase price, where the claimant is obligated to reimburse the transferee. In such a case there is a loan of credit by the transferee to the claimant (citing authorities). . . . Contrary to defendant's contention it is not necessary that there be an express agreement by the claimant to repay the loan. An agreement to repay may be implied (citing cases). Of course, the trustee of the resulting trust holds the legal title as security for the loan (citation). . . . Where the elements of a resulting trust are present, the fact that transferee and payor of the purchase price, and the claimant, made an oral agreement that the former was to hold the property in trust for the latter which was unenforceable under the statute of frauds or otherwise, does not prevent a resulting trust from arising. Indeed, such agreement supports the inference or presumption that the payor did not intend that the transferee should have the beneficial interest (citations).''

''Although this is a three party rather than a two party transaction, wherein the one who takes title to the property holds it as trustee for the party to whom he loaned the purchase money, and also holds a lien as mortgagee for repayment of the loan, the usual rules applying to a deed absolute-mortgage case apply here. (2 Bogert, Trusts and Trustees, § 455; 17 Cal.Jur., Mortgages, §§ 53, 54.) The present case is what is termed 'a resulting trust by way of mortgage.' (2 Bogert, Trusts and Trustees, § 455.)'' (*Wilcox* v. *Salomone,* 118 Cal. App.2d 704, 710 [258 P.2d 845].)

Under all the circumstances of this case, the evidence in the record before us is sufficient to support the judgment. (*Beeler* v. *American Trust Co.,* 24 Cal.2d 1 [142 P.2d 583].)

Defendants' contention that the trial court erred in admitting testimony over their objection concerning the conduct of plaintiff Marty Sherman and his declarations as to ownership long after the deal with defendant Carlo Panno had been made is untenable. ■ It has long been the law of California that a deed absolute on its face may be shown by parol evidence to have been in fact a mortgage; and that, in order to determine the true character of the transaction, the trial court should consider all the facts and circumstances surrounding the transaction, including the conduct of the parties before and after. (*Montgomery* v. *Spect,* 55 Cal. 352, 353; *Beeler* v. *American Trust Co.,* 24 Cal.2d 1, 21-24 [147 P.2d 583].)

The order granting a new trial is reversed, and the judgment is affirmed.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied January 3, 1955, and defendants and appellants' (Vivian Panno and Carlo Panno) petition for a hearing by the Supreme Court was denied February 2, 1955. Schauer, J., was of the opinion that the petition should be granted.