Filed 11/17/14  Avila v. Lin CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| MARIA FRANCISA AVILA et al.,<br><br>  Plaintiffs, Cross-defendants and Appellants,<br><br>     v.<br><br>MING TANG LIN,<br><br>  Defendant, Cross-complainant and Appellant.<br><br><br>PATRICK BULMER, as Receiver, etc.<br><br>  Objector and Appellant. | G049947<br><br>(Super. Ct. No. CIVRS 1010040)<br><br>O P I N I O N |


Appeal from a judgment and postjudgment orders of the Superior Court of San Bernardino County, Joseph R. Brisco, Judge.  Affirmed in part and reversed in part.

Squire Sanders and Stephen T. Owens for Defendant, Cross-complainant and Appellant.

Law Offices of Anthony Cosio and R.M. Anthony Cosio; Law Offices of Thomas Armstrong and Thomas Armstrong for Plaintiffs, Cross-defendants and Appellants.

Patrick Bulmer, in pro. per., for Objector and Appellant.

*    *    *

According to plaintiffs Maria Francisa Avila and Aidy Yang, defendant Ming Tang Lin is a fraudster who tricked plaintiffs into committing assets and efforts to an agricultural venture Lin never intended to support. According to Lin, plaintiffs pursued an ultimately unsuccessful business opportunity with funds borrowed from Lin at their own risk. The jury believed plaintiffs to the tune of $1,853,000 in damages. The court granted a new trial on the question of damages, but allowed the fraud liability findings to stay in place. Plaintiffs, Lin, and receiver Patrick Bulmer (who was appointed in the immediate aftermath of the jury's verdict but whose order of appointment the court ultimately deemed void) appeal the judgment and various postjudgment orders. We affirm for the most part, reversing only the court's order granting judgment notwithstanding the verdict (JNOV) as to Yang's breach of contract cause of action.

## FACTS

Given the jury's findings, one document is conspicuous by its absence. There is no written agreement (or even a business plan) setting forth the obligations of the parties with regard to the agricultural business at the center of this case. Instead, the parties' understandings concerning the nature of the farming operations on land owned by Lin are all based on oral conversations.

2

On the other hand, a promissory note and accompanying deed of trust are in the record. In the note, Avila promised to pay Lin $500,000 with interest from December 12, 2008, "for value received." In the deed of trust, Avila pledged as security for the promissory note a Chino, California real property (the Avila Property). In their testimony, the parties' expressed differing views concerning the purpose and meaning of these documents. The jury found there was no loan. And as part of the judgment, the court quieted title in the name of Avila, declaring void and cancelling the Avila Property deed of trust.

*Yang Testimony*

Although unmarried, Yang and Avila have lived together for 20 years and have two children together. In 2007, Yang's family lived at the Avila Property. Yang worked as a licensed contractor, building koi ponds.

Lin hired Yang to build a koi pond at Lin's Hacienda Heights residence. After completing the job, Yang invited Lin to the Avila Property to see Yang's personal koi pond and the fish therein. During this visit, Lin noted the large size of the lot and asked Yang why he did not develop the property by building multiple houses.

In the summer of 2008, Lin invited Yang to his house and introduced Yang to Dong Shu, a farmer. Around September 2008, Lin again invited Yang to his house. This time, Lin explained he was in the midst of a dispute with a firm named Lucky Farm. Lin wanted Yang to partner with Lin and Shu to take over the farming operations at a property in Riverside County (the Farm). Lin owned the Farm, including 20 acres of greenhouses. Lin and Shu also wanted to rent additional acreage from another nearby landowner.

Yang had no experience with farming, a fact he relayed to Lin. But Shu and Lin had farming knowledge. Lin said he wanted Yang to learn the business and supervise the operation as a trusted representative of Lin (i.e., Lin's "sidekick"). Lin

3

could not travel to the farm on a daily basis because of health problems. Yang would "watch the books" and "make sure . . . Shu [did] the job."

Yang would not be paid a salary. Instead, he would receive one third of the profits. Yang would have to quit his job to devote his time to the Farm. Lin proposed a five-year partnership. "In the beginning, [Lin] and . . . Shu was there and tell me there's approximately $100,000 of profit every month." Yang believed this representation, which motivated him to work at the Farm.

Despite reservations, Yang ultimately agreed to take on the job and began working at the "end of 2008." He did so despite the absence of a written contract because of the trust he had in Lin, based on their shared Chinese culture and language. Yang never asked for a written contract. Instead, Yang relied on Lin's oral representations.

Lin, conversely, asked for a promissory note and deed of trust, which Avila provided in December 2008. But Lin did not actually loan Avila or Yang $500,000. Lin provided no money to either plaintiff. The documents were "for good faith to show security for partnership." Both Lin and Yang convinced Avila over the course of weeks or months to sign the documents. Lin never mentioned the payment of money. Lin did, however, collect multiple undated checks all at the same time from plaintiffs (for $480,000 and smaller amounts). Lin said this was for tax purposes; Lin needed to show he could pay his property taxes. Lin insisted he would not cash the checks, which were just for show. Yang denied that checks he wrote payable to Lin were loan payments. It was Lin's idea to write the word "interest" on some of these checks. Yang never had $480,000 in his bank account.

When Yang arrived at the Farm, it was in horrible shape. The soil on most of the acreage was too acidic to grow crops. The greenhouses were damaged. Weeds and garbage covered the land. Most of the plastic pipes were broken. There was no electrical power available from the utility company; the operation had to use a small generator. The mobile home lacked a permit. The garbage on the Farm and the

4

unpermitted mobile home had triggered code enforcement actions by Riverside County authorities. Lin kicked Shu out of the partnership after five months based on allegations Shu was stealing. Yang believes Shu stole from the partnership.

Despite these difficulties, Yang honored his commitment to the Farm. He quit his job. He expended his own funds to remedy problems and jumpstart the operation. Yang purchased farm equipment, including three tractors and various implements. Yang paid the agricultural workers. Yang paid rent on the additional acreage obtained from another landowner (other than Lin). After Shu's departure, Yang had "no choice" but to start living at the Farm and managing all farming operations. Lin did not reimburse Yang for any of his costs. Lin did contribute some money to the enterprise ("[Yang] put some, and then [Lin] put some. [Lin did not] reimburse the whole thing").[1]

Yang grew various vegetable crops, including om choy, yam leaf, amaorose, garlic, and ton ho. These crops could earn varying amounts per harvested box, depending on the crop and time of year. Hypothetically speaking, based on the available greenhouses, Yang could have harvested approximately $180,000 worth of vegetables (gross) per month, about eight months per year.[2]

---

[1] On cross-examination Yang agreed that Lin provided "most of the money that financed this alleged partnership." Yang did not find it "unusual" "that the person supplying all the money has no check-writing authority or access to any of the funds." It is unclear whether Yang really meant to agree with these statements, as they seemingly conflict with the gist of his other testimony. It does not appear that the parties attempted to prove their respective assets in the summer of 2008 (i.e., prior to their agreement to start an agricultural business at the Farm). One productive method for getting at the truth in this case might have been to trace the expenditures at the Farm to preexisting asset sources (whether in the possession of plaintiffs or Lin).

[2] The court sustained an objection on the grounds of speculation to a question asking Yang whether there would have been profits at the farm absent Lin's interference.

5

Despite Yang's best efforts and financial contributions, Yang was never paid any profits by Lin. In 2009, the Farm lost nearly $420,000 (bringing in more than $180,000 but spending nearly $600,000). This loss is perhaps partly explained by the large expenses to get the Farm started (e.g., the huge cleanup of garbage).

In the summer of 2010, Yang and Lin argued about the Farm. Yang accused Lin of intending to use Yang to improve the Farm for purposes of selling it rather than to enter a profitable partnership. Lin replied that he did not want to partner anymore but would instead take plaintiffs' house. Lin disclosed that he already had a plan and bank financing to build 11 houses on the Avila Property. Lin demanded that Avila sign the Avila Property over to Lin or Lin would cash the checks previously made out to him by Yang.[3] Lin also initiated foreclosure proceedings on the Avila Property. Plaintiffs filed a complaint with the San Bernardino County Office of the District Attorney.

Lin served Yang with a three-day notice to pay rent or quit the Farm property, in which Lin claimed Yang owed $12,500 in rent. But Yang never had an agreement to lease the Farm from Lin. A trial court ultimately dismissed an unlawful detainer action filed by Lin. But then someone locked the gates at the Farm and took the key from the water pump. Yang successfully obtained injunctive relief to allow him continued access to the Farm. But on December 15, 2010, someone bulldozed the irrigation pipes on the portion of the Farm used by Yang. Yang thought it was Dong Jiang, a new tenant at the Farm. Yang called the police. There was more than $6,000 in damages. After this incident, Yang did not continue farming efforts and crops valued at approximately $90,000 died.[4] Jiang called Yang and warned him that Lin was trying to hire someone to kill Yang.

---

[3] When Lin tried to cash the checks (which when submitted had different typewritten dates), they were returned (marked "altered/fictitious") by the bank.

[4] The court sustained an objection on the grounds of speculation to a question asking Yang whether there would have been a profit had these crops not died.

6

*Testimony of Avila*

Lin wanted Avila to sign the deed of trust; Avila did not read the document before signing it. Lin said not to worry about the document. Lin said, "This is something between us only. I will never touch your house." Avila believed Lin. Avila did not discuss matters pertaining to the partnership between Yang and Lin. Avila signed the deed of trust because Yang and Lin "were going to be partners, and it was like a security." Avila had no clear conception of what "security" meant in this context. Avila could not pay her bills, including the house payment, as a result of Yang's lack of income. Avila's attempt to modify her home loan failed because her lender stopped the modification process when it was discovered she had been accused of fraud in Lin's cross-complaint.

*Testimony of Jiang*

In November 2010, Jiang entered an agreement with Lin with regard to the Farm. Jiang invested $800,000 to improve the land and was told he would be repaid this money plus a profit when Lin sold the land.

At the time he tried to take possession of the Farm, Jiang knew there was a dispute between Lin and Yang. Jiang refused Lin's instructions to remove all of the vegetables from the greenhouses. Jiang destroyed two greenhouses before he realized there were growing crops within them. Jiang called police for help in kicking out Yang's employees, as he was instructed to do by Lin. At Lin's direction, Jiang broke the irrigation pipes. In late 2010, Lin asked Jiang to find someone to kill Yang.

When the Farm was sold for $5 million, Lin did not pay Jiang anything, but simply locked up the Farm and kicked Jiang out. Lin relied on a lease he prepared (purportedly to show investors) to misrepresent the nature of his agreement with Jiang as one of landlord and tenant.

7

*Lin's Testimony*

Lin bought the Farm in 1989 for $360,000; he paid cash. There were no crops growing on the Farm. Lin began growing crops in 1997, but stopped in 2002 because of kidney problems. Lin sold the Farm in 1994 (2004?) for $3.7 million but then reacquired the Farm in 2008 by foreclosing on the buyer.[5] Lin agreed he met Yang as a result of a koi pond transaction, but denied he ever commented about the size of the Avila Property and the opportunity to develop it.

By the time of the 2008 foreclosure, the 1994 (2004?) buyer had leased the farm to Shu. In 2008, Yang and Shu came over to Lin's house uninvited with a proposal to continue farming the land. Yang and Shu were partners. Lin refused to lease to them.[6] Lin was old and wanted to sell the land. Lin told Shu he could stay on the Farm until December 2008 when the foreclosure would be completed. Shu was then forced out by Yang. Lin did not "participate in any matters within their company." Lin denied he created a partnership with Yang and Shu. Lin denied that Yang ever had permission to use the Farm.

Yang wanted to borrow money from Lin because Yang did not have sufficient funds to continue farming operations. Lin "said no because he did not have any credit unless he could give me something as collateral. Then I would think about it. I loaned him $130,000, but I did not want to give him more." This money was gradually loaned to Yang beginning in August 2008 without any documentation. Each time Yang came back to Lin, Lin loaned Yang more money, and $480,000 in "principal" had been

---

[5] There is no explanation as to how Lin started then stopped growing crops on land he had already sold, but perhaps he actually sold the Farm in 2004.

[6] In his September 2010 complaint for unlawful detainer against Yang, Lin verified under oath that Yang agreed to rent the Farm for $2,500 per month as a month-to-month tenancy. Lin testified at the unlawful detainer trial that he received four rent checks but two of them bounced. At this trial, Lin insisted the two valid checks were paid by Shu as rent according to his arrangement with the prior owner.

8

provided to Yang at the time Avila signed the promissory note and deed of trust. Avila "volunteered" to sign the documents; Lin "warned her three times" about the consequences of nonpayment of the loan. Lin denied this was money paid into a farming partnership. Besides his own testimony, the note, and the deed of trust, Lin's only evidence for these loans were the checks he received from Yang that were rejected by Yang's bank.[7]

Lin denied asking Jiang to force Yang off the Farm. Lin was not happy that Yang was still on the Farm,[8] but denied asking Jiang to close the gate or destroy the irrigation pipes. When Jiang said he planned to physically harm Yang, Lin told Jiang not to do it.

*Testimony of Vanessa Pappilli*

Vanessa Pappilli, a real estate broker and close friend of Avila, testified that the Avila Property had a value of $320,000. Aurora Loan Services (Aurora) had a first deed of trust on the Avila Property securing a $400,000 loan. In July 2010, Pappilli attempted to modify this loan for Avila pursuant to a federal loan modification program. The modification could have resulted in substantial savings for Avila — an 18 percent principal reduction and a reduction in monthly payments. Avila did not qualify for the

---

[7] Again, it is inexplicable that no one attempted to trace the hundreds of thousands of dollars that were spent at the Farm from late 2008 to 2010. Did plaintiffs have money stashed away just waiting to be spent on a business opportunity? Did the money come from a bank loan procured by Yang? Was money transferred from Lin to Yang in late 2008? Yang claims it was, but he did not introduce documentary evidence other than the returned checks and the promissory note. The court rejected Yang's last-minute effort to introduce additional checks that had not been produced in discovery, which purportedly showed funds transferred to Yang by Lin. The court found it incredible that Lin "emphatically testified last week that all he had was [the bounced] checks . . . . And then after a four-day recess, he shows up with documents."

[8] "It was my property. I did not go to his home to plant any plants."

9

program because of the pendency of Lin's cross-complaint accusing her of fraud. If Aurora conducted a foreclosure sale, Avila would likely face a deficiency judgment in the amount of $100,000 to $120,000.

PROCEDURAL HISTORY

Plaintiffs' operative complaint included causes of action (1) to quiet title to the Avila Property, and (2) for fraud and/or negligent misrepresentation. After the close of evidence, the court granted Yang's oral motion to amend the pleadings to conform to proof, adding a breach of contract cause of action to his claims.

Lin's operative cross-complaint featured causes of action for (1) fraud, (2) conversion, and (3) unjust enrichment. The court also allowed Lin to amend his pleadings to conform to proof to add a breach of contract cause of action based on the promissory note for which the Avila Property served as security. But the court granted plaintiffs' motion for directed verdict as to Lin's fraud and conversion causes of action.

The jury returned their verdict by way of special verdict forms on July 26, 2012. With regard to Avila's fraud claim, the jury found (1) Lin made an important false representation of fact to Avila; (2) Lin knew the representation was false or made the representation recklessly without regard for its truth; (3) Lin intended that Avila rely on his representation; (4) Avila reasonably relied on Lin's representation; (5) Avila's reliance was a substantial factor in causing her harm; and (6) her damages (based on "past economic loss") were $200,000. The jury separately made the same findings with regard to Yang's fraud claim. As for Yang's fraud damages, the jury awarded $1.5 million, comprise of $222,000 in past economic damages ($194,000 in lost earnings and $28,000 in medical expenses) and $1,278,000 in future economic damages ($1.2 million in lost earnings, $35,000 in medical expenses, and $43,000 in other future economic loss).

10

As to Yang's breach of contract cause of action, the jury found (1) Yang and Lin entered a contract; (2) Yang did all or substantially all of what was required of him; (3) all the conditions required for Lin's performance were met; (4) Lin did something the contract prohibited him from doing; (5) Yang was harmed by Lin's failure to perform; and (6) Yang suffered damages in the amount of $216,000 (comprised of $6,000 in special damages, $120,000 in out-of-pocket costs, and $90,000 in damage to perennial crops). The jury rejected Lin's cross-complaint for breach of contract, finding Lin and Yang[9] did not enter a contract.

The same day the jury returned their verdict, the court granted plaintiffs' ex parte application for a temporary restraining order, enjoining Lin from transferring any assets and freezing his bank accounts. The court also indicated it would grant plaintiffs' ex parte request for the appointment of a receiver.

On July 30, the court entered an order granting plaintiffs' ex parte application for the appointment of a receiver. Also on July 30, the court entered judgment quieting title in favor or Avila and against Lin, finding as an equitable matter (with the advisory assistance of the jury's verdict) that Lin had no claim to the Avila Property. The court declared Lin's alleged deed of trust to be void and cancelled.

On August 2, 2012, the court entered judgment on the special verdict. On its own motion, the court struck the award of $63,000 in medical expenses to Yang. As modified, the judgment included: (1) Avila's fraud claim — $200,000 in damages to Avila and against Lin; (2) Yang's fraud claim — $1,437,000 to Yang and against Lin; (3) Yang's contract claim — $216,000 to Yang and against Lin; and (4) Lin's contract claim — no recovery for Lin. The court totaled the recovery in the final paragraph of the judgment, ordering that Yang and Avila "have and recover from [Lin] damages in the sum of $1,853,000.00 . . . ."

_____

[9] Strangely, given that Avila's name was on the promissory note and deed of trust, the special verdict form did not ask whether Lin and Avila entered into a contract.

Lin substituted in new counsel on August 6, 2012, and a flurry of postjudgment motions followed in short order. On September 11, the court granted Lin's motion to vacate the order appointing a receiver, which was deemed to be void ab initio, in part because the order did not require plaintiffs to provide an undertaking.[10] On September 24, the court deemed its temporary restraining order also to have been void ab initio. On October 9, the court denied Lin's motion to vacate the judgment quieting title.

On October 12, 2012, the court entered an order on Lin's motions for judgment notwithstanding the verdict or, alternatively, for new trial. The court granted a new trial as to damages only with regard to both Avila's and Yang's fraud claims, concluding "that the evidence presented at trial was insufficient to justify the jury's award." As to Avila, the court noted that Pappilli's testimony was the only evidence proffered to show damages suffered by Avila, but this evidence did not show how Avila suffered $200,000 in economic damages. As to Yang, the court noted the lack of evidence that the farm was ever profitable and the lack of evidence showing Yang lost earnings in his koi pond building business.[11]

The court also granted Lin's motion for judgment as a matter of law with regard to Yang's breach of contract cause of action. The court denied, however, Lin's motions for judgment as a matter of law as to the fraud causes of action.

---

[10] Despite being warned by Lin's new counsel that the order appointing him was defective, the receiver promptly recovered from Lin and deposited in his own account more than $23,000. The receiver then paid himself approximately $9,000 for services provided, leaving $12,613.78 in the account. The receiver did not deduct $2,000 of his fees and costs out of the recovery because this amount had been paid in advance by plaintiffs' counsel, without the approval of the court.

[11] The court commented at the hearing, "[W]hen I looked at the verdict, the verdict's a mess and that's why I'm granting a new trial on the damages because it's just not right." "I don't know how the jury came up with that."

At an October 29, 2012 hearing, the court ordered the receiver to turn over all assets he had collected (but not returned) to Lin. The court denied plaintiffs' oral motion to hold this money in a court account.

DISCUSSION

Lin appeals, claiming the court should have entered judgment as a matter of law in his favor on plaintiffs' fraud claims. Plaintiffs appeal, claiming the court should not have granted any of Lin's posttrial motions attacking the judgment. And the receiver appeals the court's order deeming his initial appointment order void.

*The Court Had Jurisdiction to Rule on Lin's Motion for New Trial/JNOV*

As an initial matter, plaintiffs claim the court lacked jurisdiction under the Code of Civil Procedure[12] to issue its order granting in part Lin's motion for judgment notwithstanding the verdict and motion for a new trial. "Section 629 provides that the court must rule on a JNOV motion by the last date upon which it has the power to rule on a new trial motion. Section 660 sets forth three triggering events for the 60-day jurisdictional requirement under which a court must rule on a new trial motion. The 60-day period commences upon the earliest of three events: (1) when the clerk of the court, pursuant to court order, mails notice of entry of judgment; (2) when any party serves written notice of entry of judgment on the moving party; or (3) if no such notice has been previously given, upon the filing of the first notice of intention to move for a new trial." (*Pratt v. Vencor, Inc.* (2003) 105 Cal.App.4th 905, 909.) These "time limits are mandatory and jurisdictional, 'and an order made after the 60-day period purporting to

---

[12] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

rule on a motion for a new trial is in excess of the court's jurisdiction and void.'" (*Green v. Laibco, LLC* (2011) 192 Cal.App.4th 441, 447.)

Judgment quieting title was entered July 30, 2012.  A separate judgment was entered on the special verdict on August 2.  The clerk of the court did not mail the notice of entry of judgment to the parties with regard to the entry of either document.  Lin filed his notice of intention to move for a new trial on August 16.  The court issued its initial ruling (via a conclusory minute order) on October 9 and amended this ruling on October 12 with its final order (a four-page document explaining the grounds upon which the court granted the motion).  Clearly, if the 60-day time limit began running August 16, the court's order was timely because the October 12 order came 57 days after Lin filed his notice of intention to move for a new trial.

But plaintiffs claim they served Lin's trial counsel, Mason Yost, with a file-stamped copy of the judgment by mail on August 6, 2012.  Plaintiffs conclude the court's 60-day jurisdictional time limit to rule on Lin's motion expired on October 5.  (See *Palmer v. GTE California, Inc.* (2003) 30 Cal.4th 1265, 1267-1268 [copy of file-stamped judgment served by party satisfies requirement of serving notice of entry of judgment]; *Westrec Marina Management, Inc. v. Jardine Ins. Brokers Orange County, Inc.* (2000) 85 Cal.App.4th 1042, 1047-1049 [service by mail does not extend 60-day jurisdictional limit].)  In support of this assertion, plaintiffs cite (1) an August 6 proof of service referencing the judgment (which was filed with plaintiffs' motion for reconsideration of the court's order granting a partial new trial and partial JNOV), and (2) a declaration (filed with plaintiffs' reply papers in connection with their motion for reconsideration) executed by a paralegal working for plaintiffs' counsel, who claimed in the declaration that he served the file-stamped judgment on August 6.[13]

---

[13]  Contrary to the advice of our Supreme Court, plaintiffs did not promptly file a copy of the notice of entry of judgment with a proof of service.  "Counsel who has served notice of entry of judgment *should* thereafter promptly file a copy of the served

14

Lin counters that he was never properly served with the notice of entry of judgment. On August 3 (a Friday), Lin retained Squire Sanders as new counsel; attorney Jeffrey Renzi left a phone message with plaintiffs' counsel, R.M. Anthony Cosio, informing him of that fact. At 9:50 a.m. on Monday, August 6, attorney Christopher Petersen e-mailed Cosio; this e-mail informed Cosio that "substitutions of counsel will be filed" that morning. Later the same day, Squire Sanders filed a substitution of attorney form with the court and faxed a file-stamped copy of the substitution of attorney form to plaintiff's counsel at 3:38 p.m. Nothing in the record suggests plaintiffs ever served a notice of entry of judgment on Squire Sanders, Lin's counsel of record, even though plaintiffs had received written notice of the substitution of counsel on August 6.

*Sherman v. Panno* (1954) 129 Cal.App.2d 375 (*Sherman*) is nearly identical to the instant case. In *Sherman*, however, the defendant served a copy of the substitution of counsel by United States mail (rather than immediately transmitting notice of substitution of counsel the day it was filed). (*Id*. at p. 377.) Thus, the notice of substitution of counsel "had not been received, and in the regular course of the mail it

document together with a proof of service. Although not statutorily required, the act of filing those documents ensures that the date on which the notice of entry was served, thereby triggering the statutory periods for making and determining posttrial motions, appears of record in the superior court file." (*Palmer v. GTE California, Inc.*, *supra*, 30 Cal.4th at pp. 1279-1280.) Thus, when the court inquired at an October 12 hearing as to when its jurisdiction ran out, the clerk "could not find" a notice of entry of judgment served by a party "anywhere." A copy of the file-stamped judgment with attached proof of service was only filed by plaintiffs after the court ruled on the motions for new trial and JNOV.

In a declaration submitted in opposition to plaintiffs' motion for reconsideration of the court's postjudgment rulings, Yost denied that he ever received a mailed copy of the file-stamped judgment. Instead, Yost received only a faxed copy (with no proof of service attached) from plaintiffs' law firm on the afternoon of August 6, 2012. (See § 1013, subd. (e) ["Service by facsimile transmission shall be permitted only where the parties agree and a written confirmation of that agreement is made"].) Yost's office maintains a regular practice of logging every document received by any method, and his records do not disclose receipt of the file-stamped judgment, other than the copy received by fax.

15

could not have been received, by plaintiffs' counsel prior to the mailing of the notice of entry of judgment." (*Id*. at p. 379.) Because service of the notice of entry of judgment was complete at the time of mailing and because plaintiffs were obligated to serve counsel of record,[14] the 60-day time limit began on the date plaintiffs served the notice of entry of judgment (even though, by the time it arrived at its destination, the recipient no longer represented defendant). (*Id*. at pp. 378-380.) According to plaintiffs, *Sherman* compels the conclusion that the court lacked jurisdiction to rule on Lin's motion.

Lin distinguishes *Sherman* on the grounds that Squire Sanders repeatedly provided notice to Cosio of their substitution into the case, both before (by phone message on August 3) and on August 6 (by e-mail and fax), including a faxed copy of a file-stamped substitution of counsel form. We agree with the distinction offered by Lin. As stated in *Sherman*, "plaintiffs' attorneys were bound by law to recognize defendants' former attorney of record *until they received written notice of a substitution of attorneys*." (*Sherman*, *supra*, 129 Cal.App.2d at p. 379.) It is certainly true that service by fax is not generally permitted absent written agreement of the parties. (§ 1013, subd. (e).) But for purposes of establishing the jurisdictional, 60-day new trial motion limit, the better rule is to deem written notice and receipt of substitution of counsel by fax (or e-mail) sufficient

---

[14] "[I]n all cases where a party has an attorney in the action or proceeding, the service of papers, when required, must be upon the attorney . . . ." (§ 1015.) "A client may of course discharge his attorney at any time [citation], but during the course of a proceeding service of papers on the attorney of record . . . binds the client until the attorney is discharged or substituted out of the case in the manner provided by law." (*Reynolds v. Reynolds* (1943) 21 Cal.2d 580, 584.) "The attorney in an action . . . may be changed at any time before or after judgment . . . . [¶] 1. Upon the consent of both client and attorney, filed with the clerk, or entered upon the minutes." (§ 284.) "When an attorney is changed . . . written notice of the change and of the substitution of a new attorney . . . must be given to the adverse party. Until then he must recognize the former attorney." (§ 285.)

16

to trigger the recipient's obligation to serve the new counsel rather than (or in addition to) the former attorney of record.[15]

*Court Correctly Denied Lin's Motion to Enter a Defense Judgment in His Favor*

Lin contends there is insufficient evidence to support the jury's findings of fraud and that he was therefore entitled to judgment as a matter of law with regard to plaintiffs' complaint. "On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion. [Citations.] If the appeal . . . raises purely legal questions, however, our review is de novo." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.)

Lin first argues that plaintiffs' trial testimony established Avila knew about the risks of signing the deed of trust and carefully considered the risks for an extended period of time. Lin concludes Avila cannot therefore claim to have relied on Lin's alleged reassurances at the signing of the deed of trust. This argument ignores the context of Lin's assurances. The jury was entitled to believe Lin lied about his intentions

---

[15] Even if this analysis is incorrect, we would not rule in favor of plaintiffs on this point. There is a serious question as to whether proper service of the notice of entry of judgment was ever provided to Yost, even assuming it was proper to serve Yost on August 6, 2012. The court did not actually rule on the factual question of whether Yost was served. However, the court would have been justified in finding that Yost was not served given the irregularities identified by Lin.

In addition, even if we were to conclude the court lacked jurisdiction to grant Lin's posttrial motions, it would not affect the substantial rights of the parties in this appeal. As it stands, we defer to the court's exercise of discretion in granting a new trial as to damages. But even if we were to decide the issues presented without deference to the court's rulings, we would reach the same result because of the lack of sufficient evidence supporting the jury's damage awards as discussed below.

to support an agricultural venture with Yang, and that the need for "security" was not for his own benefit but rather to impress third parties.

Lin next argues the statute of frauds should preclude plaintiffs' claims. (See Civ. Code, § 1624; *Sterling v. Taylor* (2007) 40 Cal.4th 757, 765-776.) While appellate counsel makes a compelling argument that the statute of frauds would have raised serious difficulties for at least some of plaintiffs' claims, this defense was not argued at trial. "The statute of frauds is treated as a rule of evidence which, if not properly raised, may be forfeited." (*Secrest v. Security National Mortgage Loan Trust 2002-2* (2008) 167 Cal.App.4th 544, 551.) Simply pleading the statute of frauds as an affirmative defense is insufficient to preserve the issue on appeal after a jury trial; a defendant must pursue the statute of frauds defense at trial and object to the presentation of evidence violating the statute of frauds. (*Howard v. Adams* (1940) 16 Cal.2d 253, 257-258.) Lin, in his reply brief, does not respond to plaintiffs' assertion of forfeiture. Lin forfeited any contention that the statute of frauds entitles him to judgment as a matter of law.

Lin's final argument, as described in a separate heading, is that Avila's quiet title claim cannot be sustained on the grounds of promissory estoppel. To the extent this section is merely a further attempt to disprove the applicability of an exception to the statute of frauds, we reject Lin's argument for the reasons already stated. Lin did not rely on the statute of frauds at trial. Thus, neither Avila nor Yang had reason to argue promissory estoppel as an exception to the statute.

Within Lin's final heading, it appears he also wishes to argue there was insufficient evidence to support a judgment in this case based on promissory fraud (at least with regard to Avila). "[P]romissory fraud is not easily established. Proof of intent not to perform is required. It is insufficient to show an unkept but honest promise, or mere subsequent failure of performance." (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1183.) Here, of course, there

18

was evidence of more than nonperformance, particularly given that it is artificial to separate the fraud committed upon Yang from the fraud committed upon Avila. Lin represented that the Farm could produce $100,000 in profits per month when he must have been aware of its dreadful condition. Lin destroyed Yang's crops. Lin acted counter to promises concerning what he would and would not do. Lin created a false documentary record (including the checks he later filled in and claimed were both rent payments and loan payments). Lin changed his story under penalty of perjury concerning the nature of his relationship with Yang. Lin had a record of unorthodox business arrangements at the Farm in which he always came out ahead. There is sufficient evidence in the record to conclude that Lin committed promissory fraud with regard to the prospect of a five year business venture at the Farm and the concomitant promise to not actually foreclose on the Avila Property. "When fraud is proven, it cannot be maintained that the parties freely entered into an agreement reflecting a meeting of the minds." (*Id*. at p. 1182.)

*Grant of New Trial as to Yang's Damages from Lin's Fraud*

"A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (§ 657.) "'A trial court has broad discretion in ruling on a new trial motion, and the court's exercise of discretion is accorded great deference on appeal.'" (*Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 119.)

Fraud damages consist of "the amount which will compensate for all of the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code, § 3333; see *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 649.)

19

"[D]amages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for recovery." (*Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 577.)

It is unclear precisely what the jury intended and relied on when it awarded Yang $1.5 million in the special verdict on fraud.[16] Regardless of the jury's specific thought process, there are two fundamental problems with the award.

First, the jury awarded $1.2 million in future lost economic earnings, presumably based on Yang's testimony about the value of crops destroyed by Jiang and the potential future value of crops grown at the Farm had Lin honored his commitment to the agricultural venture for five years.[17] But there is no substantial evidence that the farming business could ever have been profitable. The supposed $100,000 in monthly profits had already proved to be a mirage by late 2010. The court properly refused to allow Yang to testify (i.e., speculate) about whether he would have turned a profit on the crops destroyed by Jiang and whether the partnership could have been profitable in the future. (See generally *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 776-781 [affirming trial court's gatekeeper role in excluding speculative lost profits testimony].) The only evidence in the record regarding profitability shows the venture lost approximately $420,000 in its first year of operation.

---

[16] Plaintiffs take no issue with the court's postverdict removal of medical expense damages from the judgment. This issue did not play a role in the grant of a new trial on damages because the medical expenses were already eliminated before judgment was entered.

[17] As plaintiffs state in their brief, the $1.2 million "is consistent with the evidence produced as [to] the annual crop yields." There was no evidence in the record pertaining to Yang's earnings as a koi pond contractor. Thus, any award based on the fact that Yang abandoned his existing career to pursue the partnership would be entirely speculative. One guess as to what the jury actually did to come up with $1.2 million in future lost earnings is the following calculation: $33,333.33 (Yang's one-third share of the projected $100,000 monthly profit) multiplied by 12 (months per year) multiplied by three (remaining years in five-year commitment provided by Lin) equals $1,199,999.80.

20

The lack of "a profit at the time [of fraud] does not of itself prevent recovery of damages for loss of profit so long as there is an evidentiary basis establishing that the loss period was a foundation for profitable operation." (*Dean W. Knight & Sons, Inc. v. First Western Bank & Trust Co.* (1978) 84 Cal.App.3d 560, 568.) Here, there was no evidentiary basis to conclude Yang could have turned things around with adequate support from Lin. (Cf. *Nelson v. Reisner* (1958) 51 Cal.2d 161, 171 ["Various witnesses testified to the profits made by them per acre for the same crops during the years under consideration"].)

Second, even if there were substantial evidence to support a lost profits award (which there is not), Yang sought and it appears the jury awarded a double recovery. "To award the plaintiff not only lost profit but also the cost of producing the profit causes a double recovery." (*Guntert v. City of Stockton* (1976) 55 Cal.App.3d 131, 149.) Yang faced a difficult task in seeking to recover lost profits in connection with a new business that lost money in its first year of operations. Yang was on firmer ground in seeking recovery of more than $400,000 he claims he spent in reliance on Lin's representations (e.g., the cleanup costs, the purchase of tractors, the payment of rent to the adjoining landowner, the payment of employee salaries).[18] Had Yang actually introduced evidence of the income he lost by quitting his koi pond job, his lost income also could have served as a basis for recovery. But, absent additional evidence that Yang's contributions to the agricultural venture should have been paid by Lin rather than Yang, these expenses cannot be recovered as damages alongside a lost profits recovery. If a plaintiff seeks to recover lost profits, he cannot simultaneously recover necessary expenses incurred to establish the basis for a profitable business.

---

[18] We once again note that the record is unclear as to where all of this money came from. Clearly, the jury rejected the notion that it was loaned by Lin to Yang. But even Yang's testimony suggested that Lin contributed money to the venture. Taking Yang at his word that this was intended to be a partnership or joint venture of some kind, Yang cannot have been damaged by spending money contributed by Lin to the business.

21

It is unnecessary to dig deeper into the details of the jury's award, as this brief analysis makes clear that the court was within its discretion when it granted a new trial on Yang's fraud damages. We reject, however, Lin's contentions that partnership law limits Lin's ability to seek fraud damages. The jury's findings suggest this was not a case about a failed business partnership, in which each partner must live with his or her losses. Instead, Lin defrauded Yang into thinking Lin would participate in good faith with Yang in an agricultural venture, when the arrangement was really a means for Lin to take advantage of Yang's assets and efforts for his own enrichment (i.e., the improvement of the Farm and the chance to foreclose on the Avila Property).[19]

*Grant of New Trial as to Avila's Damages from Lin's Fraud*

The court likewise was within its discretion when it concluded the jury's award of $200,000 in damages (i.e., past economic loss) to Avila was not supported by sufficient evidence.

Avila defends these damages as supported by her testimony and that of Pappilli. In the absence of Lin's cross-complaint, Avila allegedly could have obtained an 18 percent principal reduction of her $400,000 home loan (i.e., $72,000). Moreover, Avila would face a deficiency of $100,000 to $120,000 if her home were foreclosed on and sold at auction. These numbers roughly equal $200,000. But one problem with this theory of damages is that it is not causally linked to Lin's fraud but rather to Lin's exercise of his right to seek redress in the courts. (See Civ. Code, § 47, subd. (b)(2)

---

[19] Lin points out in his appellate briefs that if his plan all along was to obtain the Avila Property by foreclosure, it was a foolish plan because there was a first trust deed on the Avila Property. Maybe so. But while the infeasibility of a fraudulent scheme may bear on the likelihood that there really was such a scheme, it does not mean that the jury could not find that the scheme existed. Moreover, Lin does not deny that the Farm was improved through Yang's efforts or that he ultimately sold the Farm for a significant amount of money.

22

[litigation privilege].) Furthermore, this evidence is speculative and contingent in that there is no evidence from the bank that Papilli's conclusions were accurate; the record does not provide a firm basis for concluding that the modification was a done deal but for Lin's cross-complaint (e.g., did Avila and Yang have income to make the modification work) or that there actually would be a deficiency judgment (e.g., was it a purchase money loan, and would the bank conduct a nonjudicial or judicial foreclosure). It also appears that Avila's alleged damages may be based on double (or triple) counting of harm, in that she had trouble paying her mortgage because Yang had no income. Relatedly, there are standing considerations, in that Avila is not necessarily the proper party to seek recovery of Yang's lost income. We decline to speculate as to what possible theory of damages Avila may be entitled to pursue at retrial. It is enough to observe that there is no substantial evidence supporting the jury's award of $200,000.

*JNOV on Yang's Breach of Contract Cause of Action*

A JNOV motion "may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) It is unclear why the court granted the JNOV motion with regard to Yang's breach of contract cause of action (as opposed to merely granting a new trial on damages). Regardless, we review de novo the court's order granting JNOV on Yang's breach of contract cause of action. (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1194.)

Yang argues in his opening brief that the court erred by granting this motion because the same facts supporting his fraud cause of action also support a breach of contract cause of action. We agree. There is substantial evidence supporting the following story: Yang and Lin agreed to pool their resources and efforts for five years to

23

build an agricultural business; Yang performed; Lin did not perform; and Yang suffered damages.[20]

Like the fraud causes of action, the breach of contract damages awarded by the jury ($216,000) suggest Yang may have obtained a double (or perhaps triple) recovery. There is certainly overlap in the measure of contract and fraud damages (see Civ. Code, §§ 3300, 3333), creating the danger that even if Yang settles on a coherent theory of damages, he could double count by asking the jury to conduct their damages inquiries on separate verdict forms for fraud and contract. (See CACI Nos. 3934, VF-3920 [instruction and verdict form designed to avoid this result].) Cautioning the court and parties to avoid the recovery of inconsistent damages or a double recovery by way of separate causes of action on retrial, we reverse the court's order granting JNOV and remand with instructions that the breach of contract cause of action should also be subject to a new trial on damages.

*Receiver's Contentions*

Finally, the receiver appeals the court's orders vacating the receivership and denying the receiver's subsequent motion for reconsideration. These orders turn on legal analysis, and we shall therefore exercise independent review.

The court cited two grounds for vacating the receivership as void ab initio: (1) a bond was not posted even though plaintiffs applied ex parte for appointment of a receiver; and (2) the receiver appointed in the order was not the same one identified in the ex parte application. The court's subsequent order requiring the receiver to return the assets (which the receiver had not yet done despite the court's earlier order deeming his

---

[20] Lin does not specifically respond to this issue in his briefs. To the extent it is addressed by Lin, it is tied to his assertions that (1) no contract could be proven because of the statute of frauds, and (2) the damages sought by Yang would not be cognizable were the arrangement between Lin and Yang a true partnership. As previously stated, we reject these arguments.

24

appointment void) logically followed. At the later hearing, the court found fault with the receiver accepting an advance payment from plaintiffs' counsel without seeking court approval.

The receiver acknowledges in his appellate brief that "plaintiffs' counsel took broad liberties in drafting the [12-page] receivership order to include many provisions not approved nor anticipated by the Court, and that the Court may not have made any substantial review of the terms of the proposed order before signing it. [¶] Examples include omitting a provision for an applicant's bond in the Order when plaintiffs offered to post a $500,000.00 bond [citation] [in their written ex parte application] and substitution of Bulmer's name as receiver when plaintiffs originally nominated Receivership Specialists of Los Angeles [citation]. [¶] It is easy to see why the trial court expressed such disapproval during the . . . hearing [citation]. Bulmer is likewise perturbed by the omissions and misrepresentations made by plaintiffs and their counsel in procuring his appointment and acceptance as receiver."

Nonetheless, the receiver claims the court erred in deeming the order appointing him void rather than voidable. Relatedly, the receiver contends the court erred in refusing to properly discharge the receiver (rather than simply deeming the appointment void). (See Cal. Rules of Court, rule 3.1184 [requiring receiver to present, among other things, final account and report, request for discharge, and final claim for compensation for receiver's services].) The receiver claims the court's failure to properly discharge him has not only prejudiced him in terms of potentially recovering his fees, but also led to him being forced to defend (without court-approved counsel and a means to pay for such counsel out of funds provided for by one or more of the parties in this case) a November 5, 2012 lawsuit (*Yuey v. Bulmer* (Super. Ct. L.A. County, 2013, No. BC495200)) filed by Lin and his wife in the Los Angeles Superior Court for abuse of process, conversion, infliction of emotional distress, invasion of privacy, and money had

25

and received (Los Angeles Action) based on the receiver's conduct in connection with his appointment in the instant case.[21]

We turn first to the question of whether the order appointing the receiver was void.  "*If a receiver is appointed upon an ex parte application*, *the court*, before making the order, *must require from the applicant an undertaking in an amount to be fixed by the court*, to the effect that the applicant will pay to the defendant all damages the defendant may sustain by reason of the appointment of the receiver and the entry by the receiver upon the duties, in case the applicant shall have procured the appointment wrongfully, maliciously, or without sufficient cause."  (§ 566, subd. (b), italics added.)

It is black letter law that an order appointing a receiver upon an ex parte application without the required undertaking is void.  (See, e.g., *Sweins v. Superior Court* (1936) 16 Cal.App.2d 336; *Van Alen v. Superior Court* (1918) 37 Cal.App. 696, 696-697; *Bibby v. Dieter* (1910) 15 Cal.App. 45, 48; see also Ahart, Cal. Practice Guide: Enforcing Judgments and Debts (The Rutter Group 2014) ¶ 4:901.1, p. 4-169 [citing *Sweins* for unequivocal proposition that "ex parte order that fails to require the *applicant* to post bond is void"]; 11 Miller & Starr, Cal. Real Estate (3d ed. 2009) § 33.7, p. 33-15 ["Unless an undertaking is filed, the ex parte appointment of the receiver is void"].)

The receiver claims the order was not void but rather was voidable.  The receiver points out that the ex parte application here came only after a trial on the merits; thus, this case is not like one in which a receiver was appointed early in the case without the benefit of a fair evidentiary hearing.  (See, e.g., *Davila v. Heath* (1910) 13 Cal.App. 370, 371-373 [order appointing receiver four days after complaint filed].)  The receiver also asserts the meaning of "ex parte" has changed through the years, so that older cases

---

[21] We grant the receiver's request to take judicial notice of the Los Angeles Action and various documents filed therein.  Lin and his wife dismissed the Los Angeles Action with prejudice on March 6, 2013.  That same day, Bulmer withdrew his special motion to strike the complaint in the Los Angeles Action.

applying section 566, subdivision (b), did not necessarily contemplate our modern ex parte procedure.[22] Here, the court had personal jurisdiction over Lin and subject matter jurisdiction over the parties' dispute and the enforcement of the impending judgment against Lin. (See *Baron v. Fire Ins. Exchange* (2007) 154 Cal.App.4th 1184, 1193 & fn. 7 [improper order allowing appointment of receiver by arbitrator upon parties' stipulation was voidable not void, and issue could therefore be forfeited by the third party's failure to raise the issue at the trial court level].) By the receiver's reckoning, the court committed error but did not exceed the bounds of its fundamental jurisdiction.

We reject the receiver's invitation to upset the clear rule governing this issue. As mandated by section 566, subdivision (b), parties must be protected against the unfair imposition of a receiver.[23] The return of a jury verdict does not equate to a final enforceable judgment. Unwarranted harm may be done by a receiver, including the disruption of a party's personal life and business interests. The requirement of an undertaking mitigates the potential harm that might be done while the imposed upon party seeks to challenge the ex parte appointment. The receiver should have been well-aware of the rule requiring an applicant's undertaking as a necessary prerequisite to his appointment on an ex parte basis. He must now bear the consequences, whatever they may be, of exercising authority pursuant to a void order. The court did not commit error in deeming void the order appointing the receiver and ordering the receiver to return the

---

[22] One answer to this point is that plaintiffs did not follow modern ex parte procedure (Cal. Rules of Court, rule 3.1203); plaintiffs simply sprung the motion upon Lin while on the record at trial, even though the papers had already been filed with the court earlier in the day.

[23] And as suggested by the bills generated in the course of a few weeks by the receiver in this case, the imposition of a receiver is a costly proposition. (See *City and County of San Francisco v. Daley* (1993) 16 Cal.App.4th 734, 744 ["[T]he appointment of a receiver is a drastic remedy to be employed only in exceptional circumstances." "'[R]eceivers are often legal luxuries, frequently representing an extravagant cost'"].)

27

collected funds to Lin, without provision for any of the receiver's costs or attorney fees. We likewise summarily reject the receiver's contention that the court erred by refusing the receiver's request to hire counsel in his role as receiver.

DISPOSITION

We reverse the court's order granting judgment notwithstanding the verdict on Yang's breach of contract cause of action against Lin. We affirm the court's order granting a new trial as to damages only with regard to both plaintiffs' fraud causes of action, and instruct the court to also provide a new trial as to damages only with regard to Yang's breach of contract cause of action. The court's other postjudgment orders and the judgment, to the extent it quiets title in favor of Avila, are also affirmed. The receiver's request for judicial notice is granted. In the interests of justice, the parties shall bear their own costs on appeal.

IKOLA, J.

WE CONCUR:

ARONSON, ACTING P. J.

THOMPSON, J.

28